44 C.C.P.A. (Patents).
**Henry Howard HAGAR, Appellant,**

v.

**Frank D. HAINES, Appellee.**

**Patent Appeal No. 6233.**

United States Court of Customs
and Patent Appeals.

April 4, 1957.

William A. Smith, Jr., Washington, D. C., and Howson & Howson, Philadelphia, Pa. (Charles H. Howson, Jr., Philadelphia, Pa., of counsel), for appellant.

Zachary T. Wobensmith, 2nd, Philadelphia, Pa., for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH and JACKSON (retired), Judges.

RICH, Judge.

This is an appeal by the senior party, Henry Howard Hagar, from a decision of the Board of Patent Interferences, awarding "priority of invention" as to the single count in interference to the junior party, Frank D. Haines. The issue in the case, however, is not priority in the usual sense of who was the *first* inventor but who *was* the inventor, i. e., originality of invention, a proper subject of inquiry in an interference.

The count involved is:

"In a collapsible clothes dryer, a central post adapted to be mounted in a vertical position, a pair of elongated rigid unitary clothes line supporting members adapted in the set-up position of the dryer to be horizontally disposed in spaced apart relation at opposite sides of the central post and in the collapsed position of the dryer to be vertically disposed closely adjacent and parallel to said post; a structure for moving said members between and supporting them in said set-up and collapsed positions of the dryer comprising a first pair of arms having their outer ends substantially universally connected respectively to oppositely related end portions of the clothes line supporting members and their inner ends pivotally connected to a relatively fixed point adjacent the upper end of the post, a second pair of arms having their outer ends pivotally connected respectively to the other end portions of said members and their inner ends pivotally mounted and arranged for sliding movement vertically of the post, and supporting links for said arms each having its outer end pivotally connected to one of said arms, the links connected to the arms of said first pair thereof having their inner ends pivotally mounted for sliding movement vertically of the post with the inner ends of said second pair of arms and the links connected to said second pair of arms having their inner ends pivotally connected to a relatively fixed point adjacent the upper end of the post."

The Hagar application, serial No. 167,-536, was filed on June 12, 1950. Haines filed on September 5, 1951, serial No. 245,150.

This case has an unusual history, the outline of which we think it advisable to trace.

Hagar was engaged, under the name of "Anchor Link Products" in the manufacture of collapsible back yard clothes dryers. In all, Hagar manufactured fourteen different models. Among these were an inverted "umbrella" type, and two "flat top" types. The latter are referred to as "flat top" dryers because the rope-carrying members are parallel to the ground.

The "umbrella" type has successively smaller concentric squares of rope which are progressively closer to the ground as the center is approached. The "flat top" dryers also have concentric rope squares of decreasing dimension, but all are equidistant from the ground.

Hagar's former "flat top" dryers were constructed in such a manner that four long rope-carrying members were threaded with rope in the stated concentric square fashion, with shorter supporting arms jointedly connected at one end to the said long members between their ends, their other ends being jointedly connected to a sleeve on the supporting pole. In one of those "flat top" dryers the long members were the uppermost members, in the other model the short members were the uppermost. In either type one end of each short member was affixed to a sleeve on the supporting pole and one end of each of the long members was affixed to another sleeve in such a manner that the dryer would collapse when the lower slidable sleeve was moved downward.

In December, 1949, Hagar and his sales manager examined a new clothes dryer which had come on the market which was adversely affecting Hagar's business. The competitive item was examined by Hagar and his sales manager, and the patent number copied (No. 2,459,110). A copy of the patent was subsequently obtained. This dryer had parallel ropes strung between two parallel folding bars supported from a pole by spreaders. Hagar felt that to compete he would have to bring out a dryer with a similar rope arrangement. About April of 1950 Hagar concluded that all the claims of said patent included a limitation which required the rope arms to be hinged or collapsible and that he would not infringe if he used rigid rope arms. Hagar then discussed this conclusion with his engineer, one Pierie. Appellant's brief adequately states the substance of this discussion as follows:

"* * * Hagar pointed out to Pierie that in order to produce a dryer construction within reasonable shipping dimensions the one-piece rigid rope members would have to be tumbled or rotated endwise from the horizontal to vertical position as they move inwardly against the center pole and that it was his, Hagar's, idea to accomplish this by an arrangement of long and short arms for supporting the one-piece rigid rope members which was a combination of the long and short arm arrangements used in the conventional 'umbrella' and second 'flat top' dryers [the one with the short arms below the long arms], Hagar's Exhibits A and C, respectively. Hagar further explained to Pierie that each rope member had to be tumbled or rotated endwise by causing one of its ends to rise as its other end was lowered while the member was moved inwardly against the center post, and that this could be done by utilizing a combination * * * of said Exhibits A and C * * *. In this connection Hagar pointed out to Pierie that the long and short arm arrangement of the 'umbrella' dryer (Exhibit A) used at one end of each one-piece rope member would cause the end of the arm to swing upwardly as the dryer was collapsed and that the reverse short and long arm arrangement of the 'flat top' (Exhibit C) used at the other end of each rope member would cause that end to swing downwardly thereby providing a so-called rotary or tumbling movement of the rope member from a horizontal to a vertical posi-

tion as it is moved inwardly against the center post of the dryer." (Bracketed portion added.)

Hagar then told Pierie to work out the details.

In the course of his work and prior to April 26, 1950, Pierie made sketches which are in evidence and he, with one Bagshaw, another Hagar employee and the go-between in this drama, went to a metal supply company and purchased supplies to construct a model of the proposed new dryer. Bagshaw was in charge of the paint shop and since it was not busy he had the time to follow the work Pierie was doing on the invention at bar.

On April 26, 1950, Pierie made a small model. In this model one collar was fixed at the top of the supporting pole and another collar was free to slide on the pole below it. One long arm was pivotally connected at its inner end to the upper fixed collar and a second long arm was pivotally connected at its inner end to the lower collar which was slidable on the pole. This model was fully described by witnesses, the model itself having apparently been lost. The long arms were connected at their outer ends to the rigid one-piece rope member. This connection was accomplished by passing a small bolt diametrically through the long arms and loosely mounting on each bolt a "ringlet" through which the rope member was passed. By means of this arrangement Pierie was able to achieve the tumbling or rotating action desired by Hagar. There were no "short arms" or any practical universal connection to the ends of the rigid one-piece rope arm.

■ Counsel for Hagar contends, on the basis of the above series of events, that every element of the dryer defined in the count had been conceived by Hagar and was fully known to his associates. We agree.

On Monday, May 1, 1950, the employee Bagshaw went to Hagar and requested permission to take some parts home so he could try to assemble a dryer model, having previously discussed all of the details of the proposed structure with Pierie.

Hagar agreed. Bagshaw made some small collars in Hagar's shop by drilling holes through sections of an old wooden golf putter handle. He also took home some small strips of wood.

Bagshaw then went to Haines, the junior party, an old friend of his, knowing the work done by Pierie, and asked Haines if he could make a model. He knew Haines had a shop in his home and was a maker of marionettes and other things.

After many hours of work Haines completed a small model of a half dryer, simulating the tumbling action and based on what Bagshaw had told him, completing it in the early morning hours of May 2, 1950. This wood model was made with the collars Bagshaw had made, had one rope bar, two long and two short arms, the joints being made with brads and bits of wire and is less than a foot high. It is crude and all joints may be described as "sloppy."

Bagshaw took the half model to work next day where Pierie and Hagar saw it and Hagar gave Bagshaw permission to complete a full model having the same proportions as the competitive, patented dryer, but to about ¼ scale. Bagshaw never disclosed Haines' participation in this model-making activity.

On Tuesday, May 2, 1950, Bagshaw again visited Haines and asked him to build a complete model of specified proportions. This was finished, except for stringing, on Wednesday, May 3, 1950, in the early morning hours. Wednesday afternoon, Bagshaw picked it up and took it to Hagar at the plant.

Subsequent to all this, Bagshaw told Haines that Hagar was attempting to patent the dryer. Upon learning this, Haines brought a suit in equity against Hagar and Bagshaw in the Court of Common Pleas, Montgomery County, Pennsylvania, for an injunction against selling dryers, from prosecuting the patent application, for an assignment and an accounting for damages. After this, Haines filed his patent application. The equity suit went to trial and Hagar, not Haines, was held to have conceived and

originated the dryer. The bill was dismissed. The evidence in that case was stipulated into the record of this interference and constitutes the bulk of it. Some additional testimony was taken and the interference proceeded to a decision, from which an appeal was taken to this court.

The Board of Patent Interferences awarded priority to the junior party Haines. The board stated:

"Although Hagar was the first to initiate action toward the development of a dryer of the type in question, it appears clear that neither he nor his agents had made the invention at the time Bagshaw involved Haines in the matter.

\* \* \* \* \* \*

Hagar's own description of his disclosure to Pierie \* \* \* is substantially the same as that of Pierie. It seems clear that this disclosure does not cover certain essential features of the count including the particular arrangement of the arms and the universal connections which are essential to the provision of an operative device. While the disclosure refers to combining the arm structures of dryers of the types shown in Exhibits A and C \* \* \* it is evident that these constructions involve only single pivot joints rather than the universal type connections required by the involved invention."

The board further stated that it did not consider the long arms in the small model of Pierie to be "substantially universally connected respectively to oppositely related end portions of the clothes line supporting members \* \* \*," as recited on the count.

The subject matter which Bagshow disclosed to Haines was described by Bagshaw as follows:

"Q. 66. All right. Just what transpired up there? What did you tell him, and what took place? A. Well, as I say, Mr. Haines not knowing anything about a dryer, of course, he naturally wanted to know why I was there, and I proceeded to tell him why I was there and just what I wanted to do, and, not knowing anything about it, of course, until he got more information, he didn't know where he was going anymore than—

"Q. 67. Well, what did you tell him you wanted? A. I told him that I wanted to make from these sketches we had here a clothes dryer, and I described to him, I mean, the conventional dryers that were on the market and the dryer which is known as Kamkap, and what it was doing, and so forth, and then I told him what I wanted to do was get one with an arm that would be solid and would move down into a position where it would be up against the pole, because of the shipping angle and everything else would be a lot better, instead of having to pack it in two sections. That is, to get a multi-line dryer.

"Q. 68. What did these sketches show which you had with you? A. Well, they showed in principle the superstructure of the dryer. I mean they may have shown part of the pole, but they had the general idea, I mean, of the movement and the motion, so that we could start out and go ahead and get this model put together.

"Q. 69. Well, did they show the arrangement of long and short arms, as exemplified in Exhibit J, for example? A. I wouldn't say for sure. *"By the Court:*

"Q. 70. J is the final one? A. J is the final one. *"By the Court:*

"Q. 71. Did they show the general arrangement of the long and short arms? A. They showed the general arrangement, as nearly as I can recall, of a dryer, the regular clothes dryer, plus what we were trying to attain, I mean, in the new one. I wouldn't say that they were exactly as this \* \* \*.

"Q. 72. No, not in the same length, but proportions? Was it the same

general arrangement? A. I think it was."

Hagar's arguments may be summarized briefly as follows:

(1) That Hagar had a complete conception of the invention at the time Haines became involved in the matter which was known to Pierie and by him communicated to Bagshaw.

(2) That the disclosure by Bagshaw to Haines of the invention of the count was complete, and all that was required to embody Hagar's conception in physical form was ordinary mechanical skill.

(3) That the bolt and ringlet of the described Pierie model meet the requirement of "substantially universally connected" as called for in the count.

(4) That the intended use of the arrangement of long and short arms, by reference to Hagar's other dryers as disclosed to Haines, was sufficient to meet the terms of the count as to long and short arm arrangement.

(5) That Hagar's practical knowledge and experience in the clothes dryer field, as compared to Haines' admitted complete lack of knowledge, raise a strong presumption in favor of invention by Hagar rather than Haines.

The Court of Common Pleas in Pennsylvania considered these same questions and held Hagar made the invention. Of course, that court did not consider applicability of its findings to the count here in issue. We agree with its conclusions. In dealing with the matter of universally connecting the rope arms that court said, " * * * the application of a double acting hinge arrangement in a mechanical device is not of itself a new or novel idea. Certainly double acting hinges have been used for many years and certainly such a hinge is not a new or novel idea." We feel that the ringlet arrangement of Pierie was one of many possible types of universal connections, and meets the terms of the count.

The only other limitation of the count which the board felt was not shown by Hagar to have been conceived before Haines constructed his models was the arrangement of the arms. In this we cannot agree. We feel that Hagar's statement to Pierie that the arm arrangement should be a combination of the two other types of dryers that Hagar was concerned with was sufficient since the final arrangement was, indeed, a combination of these respective relationships.

We feel that no problem requiring invention was presented to Haines and that his contributions in connection with the making of models involved only the expected skill of a mechanic. As evidence of this is the testimony of Bagshaw that the actual placement of the pivot points on the arms was achieved by trial and error, indicating that the problem to be solved, if indeed it was a problem, was merely the putting together of parts so they would work.

We agree with the Pennsylvania court that Hagar was the inventor of the invention in controversy.

In this Monday to Wednesday drama of invention, May 1 to 3, 1950, it would appear that Bagshaw, insufficiently occupied in his paint department, voluntarily undertook the making of models for which he was not equipped; that by enmeshing his friend the puppeteer, marionette maker and home craftsman, Haines, in his enterprise he unwittingly led that gentleman to mistake an artisan's achievement, in reducing the ideas of others to physical form, for invention. While Haines may be justly proud of his craftsmanship, as witness the fact that one of his models was suitable as a birthday present (without his knowledge) for Bagshaw's grandchild, the expense of two litigations has been a costly education in patent law. While his models are excellent visualizations of Hagar's ideas, transmitted through the intermediary Bagshaw, we wholly disagree with the board's conclusion that they "demonstrate Haines' conception of the entire subject matter of the count," in view of his admission that prior to Monday night he "knew nothing about clothes hangers" and the fact that after a few hours with Bagshaw he produced a model in precise conformity with ideas disclosed by Hagar

to Pierie prior to that unfortunate visit. As the board said, the case for Haines is based solely on the charge that Hagar derived the invention from him and Haines has the burden of proving it. As Haines failed to convince the Court of Common Pleas of Montgomery County, Pa., en banc, in 1953, so has he failed to convince us.

For the reasons given, the decision of the Board of Patent Interferences is reversed.

Reversed.

JACKSON, Judge, retired, recalled to participate herein in place of COLE, J., absent because of illness.